1
2
3
4
5
6
7

**O**

# United States District Court
# Central District of California

8
9
10
11  LOTTE GLOBAL LOGISTICS CO., LTD.,
12
                    Plaintiff,
13
          v.
14
15  ONE WAY ONLY TRANS, INC. et al,
16
                    Defendants.

Case № 2:23-cv-03558-ODW (ASx)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT [42]**

17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Plaintiff Lotte Global Logistics Co., Ltd. ("Lotte"), as assignee of Samsung SDI Co., Ltd. ("Samsung"), brings this interstate shipping action against Defendants One Way Only Trans, Inc. ("OWOT"), STPW Inc. ("STPW") and OMI Truck Parking Facilities, Inc. ("OMI").  (Compl., ECF No. 1.)  STPW removed the entire case from state court, (NOR, ECF No. 1), and Lotte now moves for summary judgment seeking joint and several liability against OWOT and STPW for lost cargo under the Carmack Amendment.  (Mot. Summ. J. ("Mot." or "Motion"), ECF No. 42; Compl. ¶¶ 9–15.) For the reasons discussed below, the Court **GRANTS** the Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II.       FACTUAL BACKGROUND

The following facts are taken from Lotte's Statement of Uncontroverted Facts ("PSUF"), ECF No. 42-2, STPW's Statement of Genuine Disputes of Material Fact, ("SGDF"), ECF No. 48-1, and OWOT's Separate Statement of Undisputed Facts ("OWOT AMF"), ECF No. 47-2.[2]

Lotte is a Korean corporation that provides domestic and international trade logistics services.  (PSUF 7.)  Lotte Global Logistics, North America ("LGLNA") is Lotte's wholly owned subsidiary in the United States and a licensed property broker by the Federal Motor Carrier Safety Administration ("FMCSA"). (*Id.* at 18.)  OWOT and STPW are California corporations that provide trucking services and have the operating authority of motor carriers from the FMCSA. (*Id.* at 8–9.)  Victor Melendez is the president of OWOT, and Jose Marroquin is the president of STPW.  (*Id.* at 8, 21.)  OMI is a California corporation that operates container storage yards.  (*Id.* at 10.)  This action arises from the theft of one forty-foot container of 128 packages of lithium ion batteries ("Cargo"), which was part of a seventeen-container shipment ("Shipment"), stolen from one of OMI's storage yards in Commerce, California ("OMI Yard").  (*Id.* at 1–2.)

Samsung is a Korean corporation that manufactures and exports lithium-ion batteries and agreed to sell and deliver its batteries to Nextera Energy Constructors ("Nextera") in Kingman, Arizona.  (*Id.* at 3, 12–13.)  On or before October 20, 2022, Samsung retained Lotte to transport the Shipment via ocean carrier from Busan, Korea to the Port of Los Angeles in Los Angeles, California ("Port").  (ECF No. 11.)  Upon arrival to the Port, the Shipment would be transported to Kingman, Arizona via motor carrier.  (*Id.* at 11.)  On November 1, 2022, the Shipment was sent from Busan to the Port pursuant to Waybill No. SEL1441122, which identified Samsung as the shipper and Nextera as the consignee.  (*Id.* at 3, 17; Decl. Sangwan Kim ISO Mot. ("Kim

---

[2] The Court has reviewed OWOT's Separate Statement of Undisputed Facts and determined this document is functionally intended to be OWOT's *additional* material facts.  (OWOT AMF 2.)  As such, the Court will cite to it operatively as OWOT's submission of additional material facts.

Decl.") Ex. A ("Waybill"), ECF No. 42-5.)  The batteries contained in the Shipment had passed a quality inspection test and were affixed with a seal.  (PSUF 13–16.)

On November 3, 2022, LGLNA and OWOT entered into a Broker-Carrier Agreement ("Agreement") in which OWOT, identified as a "Registered Motor Carrier," agreed to transport the Shipment from the Port to Kingman.  (*Id.* at 19; Decl. Wendy Chavana ISO Mot. ("Chavana Decl.") Ex. A ("Agreement"), ECF No. 42-6.) Melendez signed the Agreement as CEO[3] of OWOT.  (Chavana Decl. ¶ 5.)  Under the Agreement, OWOT was required to comply with all state, federal and local hazardous materials ("HAZMAT") licensing requirements.  (Chavana Decl. ¶ 1(F).)  During the relevant time, OWOT had one tractor and *did not* have a HAZMAT permit or an FMCSA property broker license.  (PSUF 8.)  In contrast, STPW had twenty-two drivers and *did* have a HAZMAT permit.  (*Id.* at 9.)  At the time, Melendez—while performing duties as the president of OWOT—was also a driver for STPW.  (*Id.*; Decl. Sook H. Lee ISO Motion ("Lee Decl.") Ex. B ("STPW Resp. to ROGs") No. 3, ECF No. 42-3; Decl. Jose Marroquin ("Marroquin Decl.") ¶ 3, ECF No. 48-2.)

Before the Shipment arrived at the Port of Los Angeles, LGLNA issued a delivery order ("DO" or "LGLNA DO") requesting that OWOT transport the Shipment from Fenix Marine Terminal in San Pedro, California ("Terminal") to Kingman.  (PSUF 20; Chavana Decl. Ex. B ("LGLNA DO").)  At the same time, LGLNA sent OWOT a dangerous goods declaration by Samsung.  (PSUF 20; Chavana Decl. Ex. C ("HAZMAT Decl.").)  Melendez received the LGLNA DO and HAZMAT Declaration.  (PSUF 21; Lee Decl. Ex. E ("Melendez Dep.") 19:11–25.) Melendez then asked Marroquin if STPW could move the Shipment.  (PSUF 21; Melendez Dep. 22:19–25, 23:4–20; 24:1–5.)

---

[3] Melendez signed the Agreement as the "CEO" of OWOT.  (Chavana Decl. ¶ 5.)  To clarify, Melendez is listed as the "President" of OWOT but apparently also performs acts as the CEO of OWOT.  (PSUF 8; *See* Chavana Decl. ¶ 5.)  Accordingly, the Court will continue to refer to Melendez as the "President" of OWOT.

Thereafter, OWOT sent DOs to STPW, with specific pick-up times concerning the Shipment, and STPW sent Pick-Up and Delivery Receipts as proof of delivery ("PODs").  (PSUF 22; Lee Decl. Ex. F ("OWOT DOs and STPW PODs").)  The OWOT DOs noted the Shipment's HAZMAT requirement and attached the HAZMAT Declaration.  (Lee Decl. Ex. F.)  STPW also issued dispatch orders to its drivers for delivery of the Shipment.  (SGDF 38; Suppl. Decl. Sook H. Lee ISO Mot. ("Suppl. Lee Decl.") Ex. D ("Dispatch Orders"), ECF No. 49-1.)  The dispatch orders provided "special instructions" that noted the HAZMAT requirement.  (Suppl. Lee Decl.)

The Shipment arrived at the Port on November 12, 2022.  (PSUF 23.)  On November 15, 2022, Daniel Banegas of OWOT arranged for four of the Shipment's containers to be picked up from the Terminal.  (PSUF 24; Lee Decl. Ex. D ("Banegas Emails").)  On November 16, 2022, the remaining thirteen containers, including the Cargo, were picked up at the Terminal and dropped off at the OMI Yard by STPW drivers, including Melendez.  (PSUF 25; Banegas Emails; Lee Decl. Ex. I ("Shipment PODs").)  Specifically, at or around noon on November 16, 2022, Melendez picked up the Cargo from the Terminal.  (PSUF 26; Lee Decl. Ex. H ("Cargo EIR, POD and Forged POD").)  Melendez then prepared a POD, by recording the container number (CGMU5420924), chassis number (TLXZ4520924), and seal number (H8269960) on STPW letterhead, which he presented to personnel at the OMI Yard.  (PSUF 26; Lee Decl. H.)  Melendez, also acting as STPW's driver, drove a tractor (license no. YP52224) owned by STPW.  (PSUF 26.)

Late in the evening on November 16, 2022, at approximately 11:45 p.m., a driver in a red tractor with STPW placards presented a forged POD on STPW letterhead to OMI's personnel, picked up the Cargo, and left the OMI yard seventeen minutes later, on November 17, 2022, at 12:02 a.m.  (PSUF 27; Lee Decl. Ex. G ("Police Report").)  Later that day, the container was found empty in Ontario, California.  (PSUF 28.)  The Shipment's remaining sixteen containers were delivered

to Kingman on November 18 and 21–22, 2022, without incident.  (PSUF 29; Lee Decl. Ex. I.)

On December 2 and 7, 2022, OWOT sent LGLNA seventeen invoices, totaling $55,624.00, which LGLNA paid on December 28, 2022, and January 4, 2023. (PSUF 30; Chavana Decl. Ex. D ("Invoices"), Ex. E ("Payments").)  On December 19, 2022, Lotte received a Claim Notice from Samsung demanding payment of the Cargo's invoice value in the amount of $533,157.12.  (PSUF 32.)  On January 9, 2023, Sook H. Lee, on behalf of LGLNA, sent Notice of Claim for the stolen Cargo to OWOT, STPW, and OMI.  (*Id.* at 31.)  On or about March 21, 2023, Lotte paid the full amount to Samsung in exchange for an assignment of Samsung's right to recover damages from Defendants.  (*Id.* at 33.)  On June 26, 2023, Lotte Insurance Co., Ltd. paid Lotte the full $533,157.12[4] amount and subrogated to Lotte's right and remedies in this action.  (*Id.* at 34.)

On March 23, 2023, Lotte filed a lawsuit in state court—on behalf of Lotte Insurance—against OWOT, STPW, and OMI, seeking a total of $547,849.99 in damages.  (*Id.* at 36.)  In its Complaint, Lotte asserts four causes of action against OWOT and STPW: 1) liability for loss of cargo under the Carmack Amendment; 2) violation of 49 U.S.C. §§ 13902, 14707, and 14916; 3) negligence; and 4) breach of bailment.  (Compl. ¶¶ 16–29.)  On May 10, 2023, STPW, on behalf of all Defendants, removed this action to federal court.  (*See generally* NOR.)  Lotte now moves for summary judgment on its first cause of action against Defendants OWOT and STPW—liability for loss of cargo under the Carmack Amendment.[5]  (*See generally*,

---

[4] Additionally, back in December of 2022, Lotte arranged and paid for transportation of the stolen Cargo's replacement and suffered an additional $14,692.87 in damages.  (PSUF 35.)

[5] In its Complaint, Lotte asserts four causes of action against OWOT and STPW.  (Compl. ¶¶ 16–29.)  In its Motion, Lotte notified the Court that Lotte will only seek summary judgment on Lotte's first cause of action.  (Mot. 5.)  Lotte will not pursure its second, third, or fourth causes of action against OWOT and STPW.  (Mot. 5.)  Accordingly, the Court **DISMISSES** Lotte's second, third, and fourth causes of action against OWOT and STPW.

Mot.)  The Motion is fully briefed.  (OWOT Opp'n, ECF No 47; STPW Opp'n, ECF No. 48; Reply, ECF No. 49.)

### III.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" where it might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the moving party satisfies its initial burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *See id.* at 324; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party."  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (emphasis omitted) (quoting *Anderson*, 477 U.S. at 250).  Courts should grant summary judgment against a party who fails to make a sufficient showing on an element essential to her case when she will ultimately bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322–23.

In ruling on summary judgment motions, courts "view the facts and draw reasonable inferences in the light most favorable" to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted).  Conclusory, speculative, or "uncorroborated and self-serving" testimony will not raise genuine issues of fact sufficient to defeat summary judgment.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Moreover, though the court may not weigh

conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

The court may assume that material facts claimed and adequately supported are undisputed except to the extent that such material facts are (a) included in the opposing party's responsive statement of disputes *and* (b) controverted by declaration or competent written evidence. C.D. Cal. L.R. 56-4. The Court is not obligated to look any further in the record for supporting evidence other than what is actually and specifically referenced. *Id.*

## IV.    DISCUSSION

Lotte moves for summary judgment on the ground that it has established a prima facie case for liability against OWOT and STPW under the Carmack Amendment. (*See* Mot. 5.) OWOT and STPW oppose the Motion on the sole ground that there is genuine dispute as to whether they were operating as a "motor carrier" within the meaning of the Carmack Amendment. (OWOT Opp'n 5; STPW Opp'n 2.)

### A.    Carmack Amendment

The Carmack Amendment, 49 U.S.C. § 14706 *et seq.*, is part of the Interstate Commerce Act and "provides the exclusive cause of action for interstate shipping contract claims." *Pac. Indem. Co. v. Atlas Van Lines, Inc.*, 642 F.3d 702, 707 (9th Cir. 2011) (quoting *White v. Mayflower Transit, L.L.C.*, 543 F.3d 581, 584 (9th Cir. 2008)). The Carmack Amendment "subjects common carriers and freight forwarders transporting cargo in interstate commerce to absolute liability for actual loss or injury to property." *Ins. Co. of N. Am. v. NNR Aircargo Serv. (USA), Inc.*, 201 F.3d 1111, 1115 (9th Cir. 2000). "[T]he statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage" was the result of an unexpected cause. *Mo. Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964). However, liability does not extend to brokers. *CGU Int'l Ins., PLC v. Keystone Lines Corp.*, No. C-02-3751 SC, 2004 WL

1047982, at *2 (N.D. Cal. May 5, 2004) ("Carmack governs carriers but not brokers.").

Under the Interstate Commerce Act, a "broker" is defined as:

a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent, sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation.

49 U.S.C. § 13102(2). The Code of Federal Regulations adds:

Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

49 C.F.R. § 371.2(a). By contrast, a "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). The term "transportation" includes:

(A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers of passengers and property.

49 U.S.C. § 13102(23). "The difference between a carrier and a broker is often blurry." *CGU*, 2004 WL 1047982, at *2. "The crucial distinction is whether the party legally binds itself to transport, in which case it is considered a carrier." *Id*. (citing 49 C.F.R. § 371.2(a)).

To establish a prima facie case of liability under the Carmack Amendment, a shipper must show "delivery in good condition, arrival in damaged condition, and the

amount of damages." *Thousand Springs Trout Farms, Inc. v. IML Freight, Inc.*, 558 F.2d 539, 542 (9th Cir. 1977) (quoting *Mo. Pac. R.R. Co.*, 377 U.S. at 138).  The burden then shifts to the carrier to show "both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Ibid.*.  Here, the parties do not dispute that Samsung delivered the Cargo in good condition and that Lotte suffered damages in the amount of $547,849.99 for total loss of the Cargo.  (PSUF 13–16, 36.)  Thus, OWOT and STPW are subject to absolute liability for this loss if they were operating as motor carriers. The Court now turns to address whether OWOT and STPW were operating as motor carriers under the Carmack Amendment.

**B.    OWOT**

Courts have recognized that a party can become liable under the Carmack Amendment by signing a Motor Carrier Agreement that identifies the party as a "motor carrier." *Contessa Premium Foods, Inc. v. CST Lines, Inc.*, No. 2:10-cv-7424-RSWL (FFMx), 2011 WL 3648388, at *3 (C.D. Cal. Aug. 18, 2011) (noting that representation as a "carrier" in motor carrier agreement is evidence of motor carrier status).  And "a carrier is not automatically considered a broker because it requests another carrier to perform the transportation. Rather, . . . motor carriers . . . are not brokers within the meaning of this section," when the motor carriers, "arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport." *KLS Air Express, Inc. v. Cheetah Transp. LLC*, No. CIV S-05-2593 FCD DAD, 2007 WL 2428294, at *4 (E.D. Cal. Aug. 23, 2007) (alteration in original) (quoting 49 C.F.R. § 371.2(a)); *see also CGU*, 2004 WL 1047982, at *2 (determining an entity has liability under the Carmack Amendment if the carrier accepts responsibility for ensuring delivery of the goods, "regardless of who actually transported them").  Finally, when a party sends a direct invoice to a shipper for transportation services, this "create[s] an inference that [it] held itself out to [p]laintiff as a transporter of

property." *Contessa*, 2011 WL 3648388, at *4 (finding direct invoice by defendant to plaintiff for the entire loading and transportation process is circumstantial evidence of carrier status).

Here, the undisputed facts demonstrate: (1) OWOT had the authority of motor carrier from the FMCSA, (PSUF 8); (2) Melendez, as OWOT's president, signed a Motor Carrier Agreement that identified OWOT as a motor carrier, (*id.* at 19; Chavana Decl. Ex. A); (3) OWOT accepted LGLNA's DO and HAZMAT Declaration and agreed to transport the Shipment, (PSUF 24–25; Chavana Decl. Exs. B, C); (4) all communications for pick-up and delivery of the Shipment, including notification of the stolen Cargo, were between LGLNA and OWOT, (PSUF 24–25; Lee Decl. Ex. D; Suppl. Lee Decl. Exs. A, B); and (5) OWOT sent a total of seventeen invoices and PODs to LGLNA related to each container of the Shipment, (PSUF 30; Chavana Decl. Exs. D, E).  This is sufficient to demonstrate that OWOT was acting as a motor carrier under the Carmack Amendment.

OWOT makes two arguments, both of which the Court finds unpersuasive. First, OWOT argues it was acting as a broker under the Agreement.  (OWOT Opp'n 9.)  However, there is no evidence that OWOT held itself out to LGLNA as arranging the Shipment for another party (i.e., STPW) to serve as the carrier.  *See* 49 U.S.C. § 13102(2).  In fact, OWOT does not have an FMCSA broker license. (PSUF 8.)  And even if it did, "a broker shall not, directly or indirectly, represent its operations to be that of a carrier."  49 C.F.R. § 371.7(b).  OWOT's argument cannot be reconciled with the undisputed facts demonstrating it signed the Agreement as a registered motor carrier, accepted the terms of LGLNA's delivery, and agreed to transport the Shipment.  Moreover, all of the events described above occurred before Melendez—acting on behalf of OWOT—even approached Marroquin regarding STPW's driving or transporting the containers.

Second, OWOT argues it notified LGLNA that STPW would transport the Shipment because OWOT did not have a HAZMAT permit.  (OWOT Opp'n 9.)

OWOT argues this voided the Agreement.  (*Id*.).  As a preliminary matter, OWOT has adduced no evidence to support its position besides Melendez's own deposition testimony.  (Decl. Gregory J. Goodheart ISO OWOT Opp'n ("Goodheart Decl.") Exs. A–N ("Melendez Dep. Excerpts"), ECF No. 47-1.)  In establishing a genuine dispute to a material fact, the party opposing a motion for summary judgment must rely on more than its own self-serving and uncorroborated testimony.  *Villiarimo*, 281 F.3d at 1061; *Thornhill Publ'g*, 594 F.2d at 738.  Melendez's claims of a subsequent and superseding spoken arrangement to the Agreement do not meet that threshold.

Furthermore, Melendez's testimony does not support the contention that LGLNA knew about the alleged superseding arrangement.  For example, OWOT claims that "OWOT told plaintiff that STPW would be the firm handling the subject shipment and not OWOT. Plaintiff agreed with this arrangement."  (OWOT AMF 3.)  Here, OWOT's proffered evidence merely demonstrates that Melendez "believe[d]" LGLNA knew STPW would transport the Shipment because he testified: "I think my son let them know."  (Goodheart Decl. Ex. C).  Whereas the undisputed evidence supports the inference that Melendez's son, Banegas, did no such thing.  The undisputed evidence reflects that Banegas sent LGLNA several emails in November 2022: November 3 (providing a price quote and confirming OWOT could handle the Shipment), November 17 (notifying LGLNA of the theft), and November 28 (assisting in resolution of the insurance claim).  (Suppl. Lee Decl. Exs. A B).  These emails do not reference STPW as an additional carrier nor do the emails clarify OWOT's inability to perform under the Agreement.  As such, the Court finds LGLNA was *not* noticed that STPW would transport the Shipment because OWOT did not have a HAZMAT permit.

In sum, the Court finds OWOT fails to produce any evidence supporting its assertion that Lotte had knowledge of OWOT's arrangement with STPW—regardless of what the OWOT-STPW relationship was.  Rather, the undisputed record

demonstrates that OWOT took responsibility for transportation of the Shipment by holding itself out as a motor carrier and subsequently demanded compensation for performance under the Agreement. Accordingly, the Court determines OWOT is liable as a motor carrier under the Carmack Amendment.

## C. STPW

A "motor carrier" is a person providing motor carrier transportation for compensation. 49 U.S.C. § 13102(14). When a trucking company hires independent drivers to use its own tractors to transport a shipment, this is evidence of its status as a motor carrier. *AXA Corp. Sols. Assurance v. Great Am. Lines, Inc.*, No. 10-cv-2023-MAS (TJB), 2015 WL 9460558, at *1 (D.N.J. Aug. 22, 2016) (notwithstanding assertions that another motor carrier handled all "operation, dispatching, and accounting," a trucking company was also a motor carrier under the Carmack Amendment where "it is undisputed that [it] hired the driver and owned the tractor-trailer that transported the Freight."). The Court finds *AXA* persuasive and instructive in the present case, as it demonstrates that one party's motor carrier status does not preclude another party's status as a motor carrier. Additionally, the undisputed facts may demonstrate that two parties acted as motor carriers with respect to the same shipment, even where questions remain as to their arrangement with one another. To the extent that the facts presented here raise such questions, they do not create a genuine dispute as to STPW's motor carrier status.

STPW was a licensed FMCSA motor carrier with a HAZMAT permit. (PSUF 9.) As such, STPW was authorized to transport the Shipment. Melendez asked Marroquin if STPW would move the Shipment and, thereafter, OWOT issued DOs to STPW and STPW issued corresponding PODs to OWOT. (PSUF 22; Lee Decl. Ex. F.) The OWOT DOs provided specific pickup times related to the Shipment, as well as a notification that a HAZMAT permit was required to transport the Shipment. (Lee Decl. Ex. F.) The OWOT DOs requested STPW to "Bill to One Way Only Trans Inc." (*Id.*). Consistent with the appointment times, STPW

dispatched its trucks and drivers to pick up the full containers at the Terminal, store them briefly at the OMI Yard, then deliver the containers to Nextera—where the Cargo was offloaded, and ultimately return the empty containers to Long Beach, California.  (PSUF 22; Suppl. Lee Decl. Ex. D.)  Each driver that moved one of the Shipment's seventeen containers was "employed by" STPW.  (PSUF 9.)

STPW argues these facts fail to demonstrate that STPW transported the Cargo or received compensation in connection with transportation of the Cargo.  (STPW Opp'n 6, 7).  This argument relies on three claims, all made by Marroquin in his declaration.  (Marroquin Decl. 3, 5–8.)  First, Marroquin states Melendez was an independent contractor with STPW, who at no time had ownership interest in STPW.  (*Id.* ¶ 3).  Second, he states Melendez asked if he could "borrow" STPW tractors and "hire" STPW drivers to move the containers, but that Marroquin did not give Melendez authority to move the containers under STPW's operating authority or HAZMAT permit.  (*Id.* ¶¶ 5–8.)  Third, Marroquin states STPW did not contract with or expect compensation from LGLNA, OWOT, or any other entity in connection with the Cargo.  (*Id.* ¶¶ 11, 13.)

STPW asserts no evidence beyond Marroquin's own assertions.  Nor does STPW proffer evidence demonstrating how any driver could have moved the containers without a HAZMAT permit—much less that Marroquin successfully conditioned the use of STPW's HAZMAT certified trucks and drivers in that regard.  (*See* OWOT SSUF 20.)  Moreover, several of Marroquin's statements conflict with Melendez's deposition testimony.  For example, Melendez testified he was Maroquin's business partner and they shared a bank account.  (Melendez Dep. 19:22–25, 22:19–25, 76:10–25.)  He also testified that, in December 2022, Marroquin told Melendez to "wait" before forwarding LGLNA's payments, and that STPW recently inquired about that money.  (*Id.* at 67:2–14, 68:5-15, 68:20–69:8, 74:7–11; 75:13–76:9.)

It is true that the record invites speculation as to the exact nature of STPW and OWOT's relationship. For example, Lotte has provided PODs for each container in the Shipment, (Lee Decl. Ex. I), and some are on STPW letterhead, while some are on OWOT letterhead. The "EIR" indicates the Cargo was picked up at the Terminal by OWOT in STPW's tractor, while the POD that Melendez issued and presented at the OMI Yard is on STPW letterhead, as is the forged POD used to steal the Cargo. (Lee Decl., Ex. H Cargo EIR, POD and Forged POD.) However, Plaintiff has demonstrated that at least five of the PODs on STPW letterhead specifically correlate with DOs issued by OWOT, instructing STPW on pick-up and billing with respect to one of the Shipment's seventeen containers. (Lee Decl. Ex. F, OWOT DOs and STPW PODs.) This is circumstantial evidence, not only that Marroquin accepted Melendez's proposal to move the Shipment, but that the Cargo was moved pursuant to that agreement.

Therefore, the Court finds Lotte has demonstrated that STPW fulfilled OWOT's request to transport the Shipment, which it was authorized to do, entitling STPW to compensation. As such, the Court finds STPW acted as a motor carrier under the Carmack Amendment. Accordingly, STPW fails to raise a genuine dispute as to any material fact—as to its motor carrier status in this case—and is therefore subject to - absolute liability under the Carmack Amendment.

### V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment.  (ECF No. 42).

**IT IS SO ORDERED.**


August 19, 2024

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**