O

# United States District Court
# Central District of California

LOTTE GLOBAL LOGISTICS CO., LTD.,

                Plaintiff,

     v.

ONE WAY ONLY TRANS INC. et al.,

                Defendants.

Case № 2:23-cv-03558-ODW (ASx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

On November 13 and November 14, 2024, the Court held a bench trial in this action.  Plaintiff Lotte Global Logistics Co., Ltd. ("Lotte") tried two claims against Defendant OMI Truck Parking Facilities, Inc. ("OMI") for negligence and breach of bailment.  The parties submitted documentary evidence and elicited testimony from Roberto Peraza, Jangkwan Kim, Minjoon Park, and Darryl Thibault.  Additionally, the Court engaged in its own questioning of witnesses and allowed subsequent cross-examination and re-direct questioning by the parties.

Having carefully reviewed and considered the evidence and arguments of counsel as presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil

Procedure 52(a).  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such, and vice versa.

## II.    BACKGROUND[1]

1.    Samsung SDI Co., Ltd. ("Samsung") is a Korean corporation that manufactures and exports lithium-ion batteries.

2.    Lotte is a Korean corporation that provides domestic and international logistics services and is the assignee of Samsung.

3.    OWOT and STPW are California corporations that provide domestic trucking services.  Victor Melendez owns OWOT and is a driver for STPW.  Jose Marroquin is the owner of STPW.

4.    OMI is a California corporation that operates a ten-acre container storage yard (the "Yard") in the City of Commerce, California.  Roberto Peraza is the CEO of OMI.

**A.    The Shipment Arrangement**

5.    In October 2022, Samsung retained Lotte to transport seventeen containers of lithium-ion batteries (the "Shipment") from Busan, Korea to Los Angeles, California, then to Kingman, Arizona.

6.    Lotte, through its U.S. subsidiary, Lotte Global Logistics, North America, contracted with OWOT to transport the Shipment from Los Angeles, California to Kingman, Arizona.

7.    Melendez arranged for STPW to transport the Shipment to Kingman, Arizona using STPW's trucks.

---

[1] On August 19, 2024, the Court granted summary judgment against Defendants STPW, Inc. ("STPW") and One Way Only Trans, Inc. ("OWOT"), finding STPW and OWOT to be liable under the Carmack Amendment, 49 U.S.C. § 14706 *et seq*.  (Order Mot. Summ. J., ECF No. 56.)

On November 11, 2024, STPW filed a Petition for Bankruptcy Protection.  (ECF No. 80.)  Consequently, the Court stayed litigation with respect to claims asserted by STPW pursuant to 11 U.S.C. § 362(a)(1).  On December 13, 2024, Lotte filed a Notice of Status informing the Court that on December 11, 2024, the bankruptcy court dismissed STPW's bankruptcy proceeding with "no discharge."  (Notice re Bankruptcy, ECF No. 86.)

8.      STPW and OMI had an existing agreement (the "Container Agreement"), dated October 8, 2021, for STPW to store STPW containers at OMI's storage yard.

**B.      The Yard's Security Measures in November 2022**

9.      The Yard did not have any instances of theft prior to November 2022.

10.     The Yard was secured by a six-foot tall fence with nylon meshing and a single point of access for entry and exit.  In addition, the Yard had over twenty-five cameras on-site, surveilling multiple locations.

11.     OMI did not employ security guards at the Yard.

12.     OMI employed one dispatcher per shift for receiving and releasing containers.  The dispatcher was stationed at the single point of access to the Yard.  Each shift was twelve hours long—the daytime shift was from 6 a.m. to 6 p.m. and the nighttime shift was from 6 p.m. to 6 a.m.

13.     OMI did not train its dispatchers to prevent cargo theft.

14.     OMI trained its dispatchers to receive and release cargo.

**C.      OMI's Container Intake and Release Procedures in November 2022**

15.     OMI's Container Agreement required that: "All drivers need POD [("proof of delivery")] or Company Slips to pick up or drop off container with companies [sic] name and information.  Containers will not be received or let go without proper documentation."  It also stated: "We are not responsible for any lost or damaged property."

16.     OMI's client-companies decided the requisite "proper documentation."  OMI adhered to each client-company's standard.

17.     Despite OMI's request, STPW did not provide to OMI samples of STPW's blank PODs or a list of STPW's drivers and trucks.  STPW did not require OMI to call STPW if a new driver dropped off or picked up STPW cargo.

18.     OMI employees did not have access to information regarding the content of the containers that were stored at the Yard.

19.     In November 2022, OMI had the following procedures for container intake and release.

20.     To drop off a container, a driver would stop at the entrance and provide a POD to the dispatcher.  The dispatcher would then inspect the container for damages and check to ensure that the following information on the POD matched the container: (1) the company name, (2) the container number, (3) the seal number (if the container is loaded), and (4) the chassis number.  Once the dispatcher verifies the information, he would record the date and time, the driver's name and license number, and the semi-truck's license plate number on the POD, and sign the POD.  He would then return the original POD to the driver and retain a copy for OMI's records.

21.     Following a container drop-off, the dispatcher would update an internal excel spreadsheet (the "Excel Sheet") by logging the company name, the chassis number, the size of the container, whether the container was empty or loaded, the date and time it arrived, and the driver's name.

22.     To pick up a container, a driver would present a POD to the dispatcher upon entry into the Yard.  The dispatcher would then verify that the container number and the seal number (if the container is loaded) match the Excel Sheet data and that the driver was from the company reflected on the POD.  After the dispatcher verified this information, the driver would be permitted to enter the Yard to pick up the specified container.  The dispatcher would sign the POD only after confirming that the driver picked up the correct container.  The dispatcher would then update the Excel Sheet with the name of the driver and the date and time of pick-up.

23.     If the dispatcher encountered issues with the drivers or the documentation, the dispatcher was directed to contact Peraza or his father.

**D.     Shipment Transport to OMI**

24.     On November 16, 2022, STPW drivers, including Melendez, picked up containers in the Shipment from the Port of Los Angeles, including a forty-foot

container containing 128 packages of lithium-ion batteries, Container No. CGMU5420924 (the "Cargo").

25.    On that same day, at 1:10 p.m., Melendez dropped off the Cargo at the Yard.  As part of the drop off procedure, Melendez provided a STPW POD to the daytime dispatcher.  STPW's POD is printed with STPW's company name and logo on a two-ply carbonless paper, with a white page on top and a yellow sheet underneath.  Melendez presented the prefilled STPW POD with his name and driver's license number, the container number (No. CGMU05420924), the seal number (No. H8269960), and the chassis number (No. TLX24520924).

26.    The daytime dispatcher checked the information on the STPW POD to ensure it matched the Cargo.  After verifying the information, the daytime discharger recorded on the STPW POD: (1) the semi-truck's license plate, (2) the date, and (3) the dispatcher's signature.  The dispatcher then gave the top white copy to Melendez and retained the yellow carbon copy.  Melendez then entered OMI's yard and dropped off the Cargo.

**E.    Theft of the Cargo**

27.    That same evening, at approximately 11:45 p.m., a driver wearing a facial mask (the "Imposter") arrived at the Yard.

28.    The Imposter drove a red semi-truck with a fake license plate and a STPW sticker on the side of the semi-truck.  The STPW sticker was an old sticker that STPW used years prior.

29.    The Imposter presented a fake driver's license and a forged POD on STPW letterhead ("Fraudulent POD") to OMI's nighttime dispatcher, Rosalio Quinones.

30.    The Fraudulent POD is visibly different from STPW's PODs.  On the Fraudulent POD, STPW's logo was enlarged, the entry fields were larger, and certain entry fields were missing.  In addition, the second page of the Fraudulent POD was white, as opposed to yellow.

31.     The Fraudulent POD had the correct container number (No. CGMU5420924) and seal number (No. H8269960) for the Cargo, but had the wrong chassis number (No. TSX2408350).

32.     On November 17, 2022 at 12:09 a.m., Quinones released the Cargo. Quinones recorded the release date and time on the Excel Sheet and on the POD with his signature.

33.     Quinones did not call Peraza or his father regarding any issues with the Fraudulent POD or the Imposter.

34.     Later that evening, at 1:52 a.m. on November 17, 2022, Melendez arrived at OMI to drop off another container.  When he arrived, Quinones showed Melendez the Fraudulent POD.  Melendez informed Quinones that the Fraudulent POD did not belong to STPW and that STPW did not dispatch the Cargo.

35.     The Cargo container was found empty in Ontario, California later that morning.

36.     At 10:28 a.m., OWOT informed Lotte by email that the Cargo was stolen.

**F.    Damages**

37.     On December 19, 2022, Samsung sent a claim notice to Lotte for $533,157.12, the value of the stolen Cargo.

38.     On June 26, 2023, Lotte Insurance Co., Ltd. paid $533,157.12 to Lotte, and Samsung subrogated to Lotte all of its rights and remedies with respect to the Cargo.

### III.    CREDIBILITY FINDINGS

39.     The Court finds Jangkwan Kim and Minjoon Park to be very credible. The Court finds Roberto Peraza and Darryl Thibault generally credible.

40.     With respect to Peraza, the Court finds his testimony fully credible, despite some conflicting answers about his knowledge regarding Quinones's employment and whether OMI conducted a background check on Quinones.

41.     Regarding Thibault, the Court finds his testimony fully credible. However, the Court need not rely on Thibault's testimony to reach its conclusion as Thibault does not have expert knowledge of the standard of care for shipping container storage yards specifically.

## IV.     CONCLUSIONS OF LAW

42.     In this bench trial, Lotte tried two claims, for negligence and breach of bailment.

43.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Lotte's claim pursuant to the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*, arises under federal law.  The Court has supplemental jurisdiction over Lotte's state law claims pursuant to 28 U.S.C. § 1367(a).

44.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Lotte's claims occurred in this judicial district.

## A.     Negligence

45.     Under California law, Lotte must prove the following elements of negligence by a preponderance of the evidence: (1) OMI's "obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty)", (2) "failure to conform to that standard (breach of duty)", (3) "a reasonably close connection between [OMI's] conduct and the resulting injuries (proximate cause)"; and (4) "actual loss (damages)."  *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009).

46.     To hold OMI liable to Lotte as a third-party owner of the Cargo under the "negligent undertaking theory" of negligence, Lotte must prove that (1) OMI "undertook, gratuitously or for consideration, to render services to" STPW; (2) "the services rendered were of a kind [OMI] should have recognized as necessary for the protection of third persons ([Lotte])"; (3) OMI "failed to exercise reasonable care in the performance of its undertaking"; (4) "the failure to exercise reasonable care resulted in [] harm to [Lotte]"; and (5) either OMI's (a) "carelessness increased the

risk of such harm", or (b) "the undertaking was to perform a duty owed by the other to third persons", or (c) "the harm was suffered because of the reliance of the other or the third persons upon the undertaking." *Artiglio v. Corning, Inc.*, 18 Cal. 4th 604, 613–14 (1998); Rest. (2d) Torts § 324A.

47. "Reasonable care typically does not mean preventing any and all harm; it means exercising reasonably prudent caution under the circumstances." *Coyle v. Historic Mission Inn Corp.*, 24 Cal. App. 5th 627, 639 (2018).

48. Lotte does not satisfy its burden to show that OMI failed to exercise reasonable care in releasing the Cargo.

49. The theft in this action resulted from the Imposter's presentation of fraudulent documents, including the Fraudulent POD, a fake driver's license, and a semi-truck displaying a fake license plate and STPW's company sticker.

50. Peraza's testimony and the evidence credibly established that OMI exercised reasonably prudent caution under the circumstances.

51. Based on Peraza's testimony, OMI did not experience theft prior to November 2022.

52. OMI's Container Agreement required the presentation of "proper documentation" to release the Cargo. Peraza testified that each company had their own standards, and that OMI complied with STPW's standards with respect to STPW cargo, including the Cargo at issue here.

53. At the time of the theft, OMI's release procedure required the dispatcher to check the POD against the Excel Sheet for the correct company name, container number, and seal number, and to verify that the driver was from the affiliated company.

54. Even though the Fraudulent POD looked different from STPW's PODs in some aspects, it contained STPW's logo (enlarged) and the correct container and seal numbers. OMI did not have samples of STPW's PODs to be on notice that the Fraudulent POD was not an authentic STPW POD.

55.    The Imposter's semi-truck bore a sticker showing STPW's company name.  OMI did not have a list of STPW's drivers and trucks, such that it would have been placed on notice that the driver was not a STPW driver and that the semi-truck did not belong to STPW.

56.    Even though the chassis number on the Fraudulent POD was incorrect, Peraza testified that, if the container and seal numbers matched the Cargo, OMI did not need to also review the chassis number.

57.    Quinones followed OMI's release procedures and released the Cargo to the Imposter after verifying that the Fraudulent POD reflected the correct container and seal numbers, and that the semi-truck bore a STPW sticker and appeared to be affiliated with STPW.

58.    In sum, based on the evidence presented, the Court does not find that Lotte presented sufficient evidence to established by a preponderance of evidence that OMI failed to exercise reasonable care when it released the Cargo under these circumstances.

**B.    Breach of Bailment**

59.    To establish a prima facie case for breach of bailment, Lotte must show: "[1] the deposit of property with [OMI], [2] a demand therefor, and [3] the failure of [OMI] to redeliver."  *Vilner v. Crocker Nat'l Bank*, 89 Cal. App. 3d 732, 737 (1979) (quoting *Gardner v. Jonathan Club*, 35 Cal. 2d 343, 348 (1950)).

60.    Lotte satisfies its burden.  Lotte deposited the Cargo with OMI, through OWOT and STPW.  Lotte and OMI stipulated at trial that demand would be futile as all parties were on notice of the theft.  And OMI failed to redeliver the Cargo.

61.    As Lotte establishes a prima facie case for breach of bailment, "the burden of proof rests upon [OMI] to explain [its] failure" by a preponderance of evidence.  *Gerbert v. Yank*, 172 Cal. App. 3d 544, 552 (1985).  OMI "must prove it exercised due care in its care and custody of [the Cargo]."  *Gardner v. Downtown*

*Porsche Audi*, 180 Cal. App. 3d 713, 715 (1986).  OMI is liable to Lotte if "it fails to establish the absence of negligence."  *Id.*

62.    For the same reasons above, OMI satisfies its burden to establish by a preponderance of evidence that it exercised due care in its release of the Cargo.

## V.    CONCLUSION

Lotte does not meet its burden to prove its negligence and breach of bailment claims.  The Court finds that OMI is entitled to Judgment in its favor.


**IT IS SO ORDERED.**


March 25, 2025

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**